UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Jennie M. Dallas
       Plaintiff,
v.

IndyMac Mortgage Services, a division of
OneWestBank, FSB; Orlans|Moran, PLLC;
And
Federal National Mortgage Association,
       Defendants

Civil Action No. _____

## VERIFIED COMPLAINT

NOW COMES Jennie M. Dallas, plaintiff in the above captioned matter, and complains of the defendant as follows:

### PARTIES AND JURISDICTION

1. Plaintiff Jennie M. Dallas ("Dallas") is a natural person residing at 90 Ormond Street, in the Mattapan area of Boston, Massachusetts ("the property).

2. Upon information and belief, IndyMac Mortgage Services ("IMS"), is a division of OneWestBank, FSB ("OneWest"). OneWest is the ultimate successor to IndyMac Bank, FSB ("IndyBank"), which was closed on July 11, 2008, by the Office of Thrift Supervision, which named the Federal Deposit Insurance Corporation ("FDIC") as conservator. The FDIC formed IndyMac Federal Bank, FSB ("IndyFed") to take control of substantially all of IndyBank.

3. On March 19, 2009, the FDIC sold IndyFed to OneWest, a newly formed federal savings bank organized by IMB HoldCo LLC, which formed IMS.

4. Upon information and belief, IMS is the servicer of Dallas' current mortgage, but is not the holder of the Note or the owner of the mortgage.

5. According to its internet site, the Federal National Mortgage Association ("FNMA") is a government sponsored entity which was chartered on February 10, 1938. The impetus for creation of Fannie Mae was twofold: the national commitment to housing and the inability or unwillingness of private lenders to ensure a reliable supply of mortgage credit throughout the country. The primary purpose of Fannie Mae was to purchase, hold, or sell FHA-insured mortgage loans that had been originated by private lenders. After World War II, Fannie Mae's authority was expanded to include VA-guaranteed home mortgages. Since being chartered, the legal foundation and purposes of FNMA have

changed somewhat, but it appears that FNMA does not make mortgage loans, but provides working capital for lenders by purchasing mortgage loans from lenders and, among other things, issuing mortgage-backed securities.

6. Upon information and belief, FNMA is the holder of the Note and owner of the mortgage.

7. Orlans|Moran, PLLC ("Orlans"), is a Michigan corporation that specializes in mortgage foreclosure, evictions, and similar legal actions. Although its principal place of business is in Troy, Michigan, it has an office at 44 School Street, Boston, MA.

8. This court has jurisdiction of this complaint pursuant to 28 USC §1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000, as Dallas seeks, in part, to prevent the foreclosure of a mortgage as to which Orlans alleges Dallas owes $351,610.43.

9. FNMA is amenable to suit by virtue of 12 USC §1723a(a).

## FACTUAL ALLEGATIONS

10. Dallas purchased the property in 1988. It is a two-family dwelling.

11. Dallas retired in 2006 from employment with the Registry of Motor Vehicles of the Commonwealth of Massachusetts.

12. Aside from her retirement income of approximately $1,245 per month, Dallas also has rental income from the property in the amount of $1,300 from the other unit in the property.

13. Dallas originally purchased the property with a mortgage, which she refinanced several times. Most recently, she refinanced with a thirty year mortgage loan from IndyMac Bank, F.S.B., in the original principal amount of $320,000.

14. The Note, dated March 30, 2007, states that the interest rate is fixed at 6.125%, but that for the first ten years Dallas is to pay interest only. This results in a monthly payment of $1,633.33 for principal and interest.

15. Commencing May 1, 2017, Dallas would be required to make monthly payments of principal and interest in the amount of $2,315.72.

16. When Dallas retired in 2006, her primary concern was to be able to care for her elderly mother, who was contributing to the expenses of the home, including the mortgage.

17. Eventually, Dallas was unable to care for her mother, who moved to a nursing home. Dallas' mother died in 2009.

18. As a result of her mother moving to the nursing home and ultimately dying, Dallas's income was reduced such that paying the mortgage because difficult, at best.

19. Dallas sought assistance from various sources to try to ease the financial strain resulting

from the loss of income.

20. Among other things, she contacted IMS, but IMS told her that it could not help her because she was, at the time, current on her mortgage. This was because, in part, Dallas was using her savings to make the payments.

21. A few months later, Dallas' financial situation deteriorated to the point where she could no longer make full payments.

22. Dallas then contacted IMS about the federal HAMP program, which, upon information and belief, is a part of the Emergency Economic Stabilization Act of 2008.

23. The Emergency Economic Stabilization Act of 2008 (EESA) was signed into law on October 3, 2008.[1] In implementing the Act, the United States Treasury instituted a number of programs, including the "Making Homes Affordable" Act, Capital Purchase Program, and Capital Assistance Program, among others. See http://www.financialstability.gov/roadtostability/programs.htm.

24. Pursuant to the plans, and the authority provided by H.R. 1424 Title I Sec. 109-110, the United States Treasury has ordered as follows:
**Mortgage Foreclosure Mitigation:** All recipients of capital investments under the Financial Stability Plan will be required to commit to participate in mortgage modification program.
http://www.financialstability.gov/about/transparencyaccountability.html
(April 16, 2009).

25. IMS provided Dallas with applications for modification of her mortgage under the HAMP program.

26. She completed the applications and, on September 1, 2009, IMS entered into a contract with Dallas for a Trial Period Plan requiring Dallas to make three payments of $929.69, beginning in September, 2009.

27. The contract further provides that if Dallas complies with the Trial Period Plan and her circumstances remain the same, "then the Lender will provide me with a Home Affordable Modification Agreement ... " (emphasis added).

28. Dallas complied with in every respect with the Trial Period Plan ("TPP") and her circumstances have not changed. In fact, Dallas continued to make the payments of $929.69 for more than a year, until December, 2010, when IMS began to refuse to accept her payments.

29. IMS never sent Dallas a permanent modification agreement, notwithstanding her full compliance with the TPP. Dallas contacted IMS many times about the permanent agreement, but it was never forthcoming.

---

[1] The full text may be found at http://www.govtrack.us/congress/billtext.xpd?bill=h110-1424.

30   Instead, IMS sent her a letter, dated December 9, 2010, stating that it was declining her request for a modification.

31   Among other things, the letter stated that the modification was declined because her "Monthly gross income" was only $380.40, a patent absurdity.

32   The letter also stated that Dallas' "FICO Score and ARM reset date and rate, if applicable, were used in the [] calculation."

33   Another letter, dated December 8, 2010, stated that Dallas was in default in the amount of $22,974.51, and that the "current name and address of the mortgage holder is IndyMac Mortgage Services", which Dallas now believes was false.

34   A third letter, dated December 13, 2010, returned Dallas' then recent payment "as the amount submitted is less than a full contractual monthly payment."

35   A fourth letter, dated December 20, 2010, stated that Dallas' loan does not qualify for HAMP because "loans that have previously started, but have not completed, a HAMP trial modification are not eligible for additional modification." This basis is unfounded because Dallas did, in fact, complete a HAMP trial modification successfully.

36   The December 9 letter sated that if within 30 days, Dallas provided IMS "with evidence that any of these input values are inaccurate, and those inaccuracies are material, for example a significant difference in your gross monthly income or an inaccurate zip code, we will conduct a new NPV evaluation." (emphasis added). As noted above, the NPV calculation was based on a patently understated gross monthly income.

37   On December 21, 2010, Dallas sent a letter to IMS requesting reconsideration due to the patent understatement of her gross monthly income. The letter included proof of her actual income from retirement and rental sources.

38   The letter was sent by first class mail, postage prepaid, and included a notice that failure to reconsider would be deemed a violation of Chapter 93A of the Massachusetts General Laws.

39   According to the Post Office receipt, IMS received the letter on December 23, 2010.

40   On January 11, 2011, IMS sent Dallas a fifth letter that was virtually identical to the fourth, and completely ignored Dallas' request for reconsideration and the information contained therein.

41   The letter did not reference Dallas' letter of December 21, nor did it purport to be an acknowledgement of her Chapter 93A demand, much less a settlement offer.

42   On March 24, 2011, IMS sent Dallas a letter notifying her that the foreclosure process had commenced. At the top of the letter was the phrase: "We are committed to working with you." The letter invited her to inquire about, among other things, a repayment plan.

43   Just two days prior to that, on March 22, 2011, Orlans sent Dallas a letter notifying her that it represents OneWest Bank, FSB, "the present holder/loan servicer" of a note give to

4

IndyMac Bank, FSB, and "mortgage given by [Dallas] to Mortgage Electronic Registration Systems, Inc." ("MERS").

44. According to the mortgage, as recorded at book 41577, page 63 of the Suffolk County Registry of Deeds on April 4, 2007, the mortgagee is MERS as nominee for IndyMac Bank, FSB.

45. On March 23, 2011, Orlans sent Dallas a letter inviting her to complete an application for alternatives to foreclosure, including a repayment plan and/or a modification. The application consisted of a "Loan Resolution Checklist" and a "Borrower's Financial Statement". The "Statement" bore the words "Fannie Mae" along with FNMA's distinctive logo.

46. On April 9, 2011, Dallas sent Orlans a letter, responding to the March 23 letter. Dallas' response included the application, as well as a statement disputing the validity of the debt within the meaning of the Real Estate Settlement Procedures Act and the Fair Debt Collection Practices Act. The letter also asserted that Dallas had a valid and subsisting Modification Contract with IMS.

47. The letter was sent by Certified Mail. Upon information and belief, Orlans received the letter on April 15, 2011. Orlans never responded to the letter.

48. On May 21, IMS sent Dallas a letter that once again invited her to apply for a repayment plan or loan modification.

49. On May 23, 2011 (a mere two days later), Orlans sent Dallas a letter captioned Notice of Acceleration of Mortgage Loan, stating that Dallas owes $351,610.43 and that foreclosure proceedings were being commenced.

50. One day later, on May 24, 2011, Orlans sent Dallas a letter essentially identical to the March 23 letter, referenced in paragraph 44 above, again inviting her to apply for foreclosure alternatives.

51. All of the above letters from IMS and/or Orlans appear to have been computer-generated, as they are not signed by an individual.

52. IMS sent Dallas a letter dated May 19, 2011, which appears to have been prepared by an individual named Mike Zupke in IMS' Correspondence Research department.

53. The letter was not responsive to any of Dallas' prior correspondence because it merely included copies of the prior modification denial letters and did not acknowledge the patent understatement of Dallas' income.

54. Mr. Zupke also indicated that he has "contacted our Loss Mitigation Department and they advised they will re-review your financial documentation to see if a modification program can be offered on this account". He further stated that "Once the review has been completed, a correspondence will be mailed to you."

55. As of the date of this complaint, no correspondence has been mailed to Dallas.

56  Because IMS is the servicer for FNMA, an agency relationship exists between IMS and FNMA. As a result, FMNA is responsible for the actions of IMS.

### Count I – Wrongful Foreclosure; Injunction

57  Based on the foregoing, Dallas avers that IMS and Orlans are pursing foreclosure wrongfully and without just cause because Dallas completed a Trial Period Plan and is fully qualified for a permanent modification of her mortgage.

58  In order to prevent damage to Dallas by way of loss of her home, IMS and Orlans should be enjoined from any further action to foreclose the mortgage.

### Count II – Chapter 93A

59  As stated above, Dallas sent IMS a letter demanding relief consistent with, and pursuant to, chapter 93A of the Massachusetts General Laws.

60  IMS received the letter.

61  IMS failed and refused to comply with her request or to make any other reasonable settlement offer.

62  By their actions, especially in failing to offer a reasonable settlement and in wrongfully pursuing foreclosure, the defendants have violated Chapter 93A, causing damage to Dallas.

### Count III – Breach of Contract

63  As stated above, Dallas entered into a Trial Period Plan with IMS. The TPP constituted a contract which provided that if Dallas complied with the Plan and her circumstances remained the same, IMS would permanently modify her mortgage.

64  Dallas complied in every respect with the contract.

65  By failing to permanently modify Dallas' mortgage and instead refusing Dallas' payments and pursing foreclosure, the defendants have breached the TPP contract, causing damage to Dallas.

WHEREFORE Dallas requests relief:
1) enjoining the defendants, jointly and severally, from any action to foreclose the mortgage;
2) ordering specific performance by the IMS and/or FNMA of its contractual obligation to enter in to a Loan Modification pursuant to the TPP contract between them;

3) monetary damages and attorney fees; and

4) such other relief as to the court seems meet and just.

March 23, 2011

                                        Respectfully submitted,
                                        Jennie M. Dallas,
                                        By her attorney,

                                        /s/          David G. Baker
                                        David G. Baker, Esq.
                                        236 Huntington Avenue, Ste. 306
                                        Boston, MA  02115
                                        617-340-3680
                                        BBO# 634889

## VERIFICATION

The undersigned states under pains and penalties of perjury that she has read the foregoing complaint, that she is the plaintiff named therein, and that all of the facts and circumstances stated therein are true and correct to the best of her knowledge, information and belief.

                                                          _Jennie M. Dallas_
                                                          Jennie M. Dallas